UNDER SEAL

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

NOV 1 4 2013

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | UNDER SEAL |
| v. ) | |
| ) | Criminal Case No. 1:13-MJ-690 |
| JACQUELINE ALFARO, ) | |
| a/k/a "Adriana Hernandez Alfaro," ) | |
| a/k/a "Francia Hernandez," ) | |
| ) | |
| OLIVIA MY AHN LEE, and ) | |
| ) | |
| MOSTAFFA MOHAMED AL NIMIRY, ) | |
| a/k/a "Abazar Mohamed El Sheikh," ) | |
| Defendants. ) | |

### AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT AND ARREST WARRANTS

I, Andrew B. Lenhart, Special Agent with the Federal Bureau of Investigation ("FBI"), Washington Field Division, being duly sworn, depose and state the following:

**I.   INTRODUCTION**

1.   This affidavit is submitted in support of a criminal complaint and arrest warrants charging JACQUELINE ALFARO, also known as "Adriana Hernandez Alfaro" and "Francia Hernandez," (hereinafter "ALFARO"), OLIVIA MY AHN LEE (hereinafter "LEE") and MOSTAFFA MOHAMED AL NIMIRY, also known as "Abazar Mohamed El Sheikh" (hereinafter "AL NIMIRY"), with knowingly, intentionally, and unlawfully combining, conspiring, confederating, and agreeing with each other, and with others, known or unknown, to distribute a mixture and substance containing a detectable amount of oxycodone, a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and 846.

2. This application is for the limited purpose of obtaining approval to issue a criminal complaint. It is not intended to include each and every fact and matter observed by me or known to the government.

3. I have been a Special Agent with the FBI since 2003. I am presently assigned to the FBI's Washington Field Division, where I investigate white-collar crimes and drug offenses. As a Special Agent of the FBI, I am empowered by law to conduct investigations, make arrests, and execute and serve search and arrest warrants for offenses enumerated in Titles 18 and 21 of the United States Criminal Code, including offenses involving conspiracies to fraudulently obtain and distribute pills containing oxycodone in violation of Title 21 United States Code 841(a)(1) and 846.

4. Title 21, United States Code, Section 841(a)(1) prohibits any person from knowingly or intentionally manufacturing, distributing, or dispensing, or possessing with intent to manufacture, distribute, or dispense, a controlled substance.

5. Title 21, United States Code, Section 846 prohibits any person from attempting or conspiring to commit any offense in the same subchapter, including those described in Section 841(a)(1).

6. Title 21, Code of Federal Regulations, Section 1308.12(b)(1)(iii) specifies that oxycodone is a Schedule II controlled substance. According to the Drug Enforcement Agency's scheduling parameters, Schedule II controlled substances are currently acceptable forms of treatment for medical issues in the United States, but they are subject to comprehensive restrictions and regulations because of the significant potential for abuse, which may lead to serious psychological and/or physical dependence. Indeed, oxycodone's effect on the abuser's brain and body is similar to heroin, a Schedule I drug. Thus, oxycodone addiction has fueled a heroin epidemic.

7. Through my training and experience, I am familiar with oxycodone, which is the main ingredient in the drugs distributed by their trade names, Roxicodone, Percocet, and OxyContin. Oxycodone has become popular among pharmaceutical drug abusers. Addicts often crush oxycodone and snort the powder. They defeat the time-release mechanism of oxycodone pills by eliminating the outer coating of the pills thereby allowing the oxycodone to be absorbed into the body faster than intended by the manufacturer. In addition, drug addicts frequently exchange prescription narcotics, such as oxycodone, for other illicit narcotics, such as cocaine or cocaine base. Pills containing oxycodone sell on the street for $1 per milligram of oxycodone. They are manufactured in 5 mg, 10 mg, 15 mg, 30 mg, 40 mg, 60 mg and 80 mg strengths. The Physician's Desk Reference Manual (2008 Edition) describes oxycodone as follows:

... OxycontinTM (oxycodone hydrochloride controlled-release)

WARNING:

Oxycontin is an opioid agonist and a schedule II controlled substance with an abuse liability similar to morphine. Oxycodone can be abused in a manner similar to other opioid agonists, legal or illicit. This should be considered when prescribing or dispensing Oxycontin in situations where the physician or pharmacist is concerned about an increased risk of misuse, abuse, or diversion.

... TABLETS ARE TO BE SWALLOWED WHOLE, AND ARE NOT TO BE BROKEN, CHEWED OR CRUSHED. TAKING BROKEN CHEWED OR CRUSHED OXYCONTIN TABLETS COULD LEAD TO THE RAPID RELEASE AND ABSORPTION OF A POTENTIALLY TOXIC DOSE OF OXYCODONE

8. The facts and information contained in this affidavit are based upon my personal knowledge of the investigation and observations of other officers and agents involved in the investigation. All observations referenced below that were not personally made by me were related to me by the persons who made such observations. This is a joint investigation conducted by several law enforcement agencies, including members of the Fairfax County Police Department, the Loudoun County Sheriff's Office, the Prince William County Police

Department, and the Montgomery County Police Department. This affidavit contains information necessary to support probable cause for this application. It is not intended to include each and every fact and matter observed by me or known to the government.

9. The evidence in support of this complaint includes statements provided to law enforcement agencies by the defendants, cooperators, pharmacists, and doctors; video surveillance; the Virginia Prescription Monitoring Program ("VPMP") reports; incident reports from law enforcement agencies; fraudulent prescriptions; and physical surveillance by law enforcement.

## II. BACKGROUND OF INVESTIGATION

10. I believe there is probable cause that ALFARO, LEE, and AL NIMIRY unlawfully distributed controlled substances, a violation of Title 21, United States Code, Sections 841(a)(1) and 846, in the Eastern District of Virginia.

### A. The Conspiracy

11. Beginning on or about October 2012 through on or about October 2013, ALFARO, LEE, and AL NIMIRY knowingly, intentionally, unlawfully combined, conspired, confederated, and agreed with others to distribute oxycodone to individuals residing in the Eastern District of Virginia. Specifically, during that time frame, an unindicted co-conspirator, who is under active investigation (hereinafter, "UCC1") illegally produced fraudulent prescriptions for oxycodone 30 mg pills using information UCC1 obtained through an email account from a medical assistant at a doctor's office known as "Erin," which this Agent has determined, through investigation, is not her real name. UCC1 paid individuals known as "runners," including ALFARO, LEE, and AL NIMIRY, who resided in Fairfax, Loudoun and Prince William Counties in the Eastern District of Virginia, to fill the false prescriptions at several pharmacies. Each runner subsequently returned the filled illegal prescriptions, usually

between 60 and 120 pills, to UCC1. UCC1 would then give the runner approximately ten to fifteen of the pills as payment. UCC1 consumed a portion of the remaining pills and sold the rest for approximately $30 to $45 per pill. ALFARO, LEE, and AL NIMIRY also distributed pills at the direction of UCC1 or for personal profit.

12. On September 26, 2013, a CVS pharmacy located in Sterling, Virginia, within the Eastern District of Virginia, contacted law enforcement to report a prescription fraud in progress. A detective from the Loudoun County Sheriff's Office involved in the investigation arrived at the CVS pharmacy in response to the report. At the CVS, the pharmacist identified ALFARO as the person who attempted to fill the prescription. The pharmacist further stated that ALFARO left upon being advised it would take thirty minutes to fill the prescription, and was expected to return before 10:00 p.m. to pick-up the filled prescription. ALFARO arrived to pick-up the fraudulent prescription while the officer was still at the CVS. The officer followed ALFARO outside towards a vehicle where she met with a male later identified as AL NIMIRY, and the driver of the vehicle, later identified as LEE. ALFARO, LEE and AL NIMIRY were arrested and read their *Miranda* rights. ALFARO, LEE and AL NIMIRY each gave statements to the police, which are further described herein. Each one was charged with one count of prescription fraud, one count of conspiracy to commit prescription fraud, one count of possession of a controlled substance listed in Schedule II, and one count of possession of counterfeit and forged documents in Loudoun County, Virginia.

### B. Jacqueline ALFARO

13. ALFARO was interviewed by law enforcement three times between September and October 2013. ALFARO reported information to local and federal law enforcement that was corroborated through several sources, including physical surveillance by law enforcement, video surveillance, other confidential informants, and documents. In sum and substance, ALFARO

related the following details regarding her drug related activities with UCC1, AL NIMIRY and LEE.

14. An individual with the initials of M.L. introduced ALFARO to UCC1 in early April 2013.[1] Specifically, M.L gave UCC1 ALFARO's name and contact information to arrange a drug transaction. The arrangement was that if ALFARO filled a fraudulent prescription for oxycodone 30 mg pills in ALFARO's own name, ALFARO would receive oxycodone 30 mg pills as payment. In order to facilitate the transactions, UCC1 would give ALFARO false prescriptions for approximately 90 oxycodone 30 mg pills.

15. According to ALFARO, in early April, she drove with M.L. and UCC1 to several pharmacies so that she could enter the pharmacy and attempt to fill a fraudulent prescription. Most of the pharmacies they visited were out of pills. Eventually, however, they found a pharmacy located in a Rite Aid in Reston, Virginia that had oxycodone 30 mg pills in stock. ALFARO entered the pharmacy and successfully presented the fraudulent prescription to a pharmacist. The pharmacist told ALFARO to return in 45 minutes to retrieve the pills, so ALFARO returned to the vehicle where UCC1 and M.L. were waiting. While they waited, UCC1 told ALFARO, "[M]y girl works at [Dr.] M.N.'s office and she will verify the script if the pharmacist calls." The prescriber listed on the fraudulent prescription was Dr. M.N. After approximately 45 minutes, ALFARO went back inside the pharmacy, paid for the pills and returned to the vehicle where UCC1 and M.L. were waiting. ALFARO gave the bottle to UCC1, and in return UCC1 paid ALFARO ten oxycodone 30 mg pills and paid M.L. fifteen oxycodone pills. UCC1 kept the rest of the pills.

16. Law enforcement officers acquired a report from the VPMP that identified

---

[1] Throughout this affidavit, certain individuals have been identified by initial only in order to protect their identities while sufficiently describing them for purposes of this affidavit.

ALFARO as the person that filled a prescription for 90 oxycodone 30 mg pills at a Rite Aid in Reston, Virginia on April 8, 2013. Law enforcement contacted Dr. M.N. to determine if the prescription was legitimate, and he confirmed it was fraudulent.

17. ALFARO also stated that approximately one week later, UCC1 called her from a blocked number and arranged for her to fill another prescription. ALFARO provided the identity of one of her relatives to put on the prescription. ALFARO successfully passed the prescription through the pharmacist and UCC1 paid ALFARO ten oxycodone 30 mg pills.

18. ALFARO added that between April 2013 and late September 2013, at UCC1's direction, she attempted to fill illegal prescriptions at least 100 times, and successfully filled between 50 and 60 prescriptions for oxycodone 30 mg pills. At least 20 or more of the prescriptions she filled were paid by Medicaid. Most of the prescriptions authorized between 60 and 120 oxycodone 30 mg pills. ALFARO used the identity of at least five people to successfully fill the prescriptions, some of which had health insurance coverage through Medicaid. Indeed, VPMP records verify that the last name ALFARO was used at least 15 times during this time period.

19. ALFARO also stated that AL NIMIRY or UCC1 always provided her with the prescriptions, which were pre-filled with a patient name, and the cash to fill them. Specifically, if Medicaid covered the transaction, they gave ALFARO $7 for the co-payment on the pills. Otherwise, they gave ALFARO about $100 to cover the cost of the pills. They always paid ALFARO approximately ten oxycodone 30 mg pills out of the filled prescription.

20. According to ALFARO, UCC1 sells the balance of the oxycodone 30 mg pills that UCC1 does not use or pay out to her conspirators for $30 to $45 per pill. Indeed, ALFARO witnessed UCC1 sell A.R., a customer of UCC1, 50 oxycodone 30 mg pills, and witnessed other large oxycodone transactions between UCC1 and A.R.

21. ALFARO also stated that she met UCC1 at her place of work several times. During each instance, UCC1 had the fraudulent prescriptions for the conspiracy in her possession. According to ALFARO, the fraudulent prescriptions were produced at UCC1's place of employment and retained in UCC1's email account.

22. ALFARO added that she is personally aware of approximately ten other people that are also involved in the conspiracy led by UCC1. Indeed, ALFARO has witnessed the transactions or been told directly by the co-conspirators that they participated. ALFARO identified these people as LEE, AL NIMIRY, S.S., C.B., A.R., and M.G, among others.

23. ALFARO also said that between July and August 2013 she purchased two to five oxycodone 30 mg pills directly from LEE for $40 to $45 per pill on at least 20 different occasions.

C. **Mostaffa Mohamed AL NIMIRY**

24. On May 20, 2013, law enforcement officers from the Montgomery County, Maryland Police Department responded to a call involving a possible prescription fraud in process at a CVS Pharmacy located at 7809 Wisconsin Avenue in Bethesda, Maryland. Officer S.P. made contact with a female who identified herself as ADRIANA HERNANDEZ ALFARO, date of birth XX/XX/1990, via a fraudulent passport. After officer S.P. determined that the identification was fraudulent, the female identified herself by her true name, JACQUELINE ALFARO.

25. A subsequent interview of the pharmacist, T.M., revealed that ALFARO attempted to fill a prescription for 60 oxycodone 30 mg pills. The name of the patient on the prescription was FRANCIA HERNANDEZ. The prescriber was listed as Dr. M.N. Officers called Dr. M.N. who told them that FRANCIA HERNANDEZ, JACQUELINE ALFARO, and ADRIANA HERNANDEZ ALFARO were never patients of Dr. M.N.'s practice. Further, Dr.

M.N. had never authorized a prescription for any of those individuals.

26. ALFARO was present with a male, later identified as AL NIMIRY. Initially, AL NIMIRY denied knowing ALFARO, so he was released after questioning. A review of the CVS surveillance video, however, showed AL NIMIRY conversing with ALFARO. Thus, officers immediately relocated AL NIMIRY across the street conversing with UCC1. AL NIMIRY was arrested, taken into custody, and returned to the CVS across the street. When AL NIMIRY was searched in conjunction with his arrest, officers found a Virginia driver's license bearing the name ABAZAR MOHAMED ELSHEIKH. A review of the contents of ALFARO's cell phone yielded multiple text messages indicating ALFARO and AL NIMIRY were planning to split the 60 oxycodone 30 mg pills with two other people.

### D. Olivia My Ahn LEE

27. As a result of the September 26, 2013 arrest described above, LEE was interviewed and voluntarily provided the information below, after she was read her Miranda Rights.

28. LEE stated that ALFARO introduced LEE to UCC1 in April 2013. ALFARO told LEE that UCC1 produced fraudulent prescriptions for oxycodone 30 mg pills on her work computer, and directed others to fill them at pharmacies located in Northern Virginia in exchange for money or some of the proceeds from the fraudulent prescriptions. ALFARO also told LEE that UCC1 has been involved in this conspiracy with other persons since approximately October 2012. ALFARO named several other individuals involved in the conspiracy, including A.R., J.H., S.S., C.B., H.M., and M.G.

29. LEE stated that from April 2013 through September 2013 she filled at least 30 fraudulent prescriptions for oxycodone 30 mg pills at pharmacies throughout Northern Virginia for UCC1. Indeed, her VPMP records verify her name was used at least ten times during this

time period. UCC1 always provided LEE with the prescriptions. The prescriptions were always pre-filled with prescriber information previously provided to UCC1 by LEE. LEE filled prescriptions in LEE's own name and in the names of other people, including individuals with health insurance coverage through Medicaid. LEE also filled prescriptions in the names of people who were not aware of the conspiracy, including her mother, Sandra Lee, Ali Nurali, and Alex Garcia. UCC1 always provided LEE with the cash to fill the prescriptions at the pharmacies. If a prescription was covered by Medicaid, UCC1 provided $7 for the cost of filling the prescription, but if there was no insurance coverage, UCC1 provided $100 to $120 to cover the cost of the prescription. Most of the fraudulent prescriptions authorized between 60 and 120 oxycodone 30 mg pills. Each time LEE filled a UCC1 generated prescription, UCC1 paid LEE ten oxycodone 30 mg pills or between $50 and $100 cash. UCC1 kept the balance of the pills to use or sell.

30. According to LEE, UCC1 has used the names of the following doctors on the prescriptions without the respective doctor's knowledge: M.N., R.N., J.G., and A.G.

31. LEE further noted that UCC1 sells oxycodone 30 mg pills for $30 to $45 per pill. LEE also sells pills for UCC1. LEE stated that she sells five to ten pills per day for UCC1. LEE identified M.L., S.L., S.S., J.H., and C.B. as people that purchased oxycodone 30 mg pills through UCC1.

32. LEE added that she introduced J.H. and M.G. to UCC1 for the purpose of passing fraudulent prescriptions. J.H. and M.G. have in fact passed fraudulent oxycodone prescriptions produced by UCC1 in return for pills from the filled prescriptions.

33. Further, on at least one occasion in August 2013, UCC1 took LEE to the hotel adjacent to the Safeway on Elden Street in Herndon, VA, which your Affiant has identified as the Holiday Inn Express located at 485 Elden Street, Herndon, Virginia. At that time, LEE

witnessed UCC1 approach a computer in the lobby of the hotel and access her email account to recover a "template" of a prescription. UCC1 subsequently altered some of the information on the prescription template, printed it on the hotel printer, signed it, and gave it to LEE. LEE filled the fraudulent prescription later that day with oxycodone 30 mg pills.

### E. Confidential Informant Number 2

34. Information in this affidavit was also obtained with the assistance of Confidential Informant 2 ("CI-2") who was interviewed by law enforcement on October 1, 2013. CI-2 had been arrested by Loudoun County pursuant to unrelated charges and asked to speak to officers about the conspiracy. CI-2 provided information to federal and local law enforcement that was corroborated through several sources, including physical surveillance by law enforcement, video surveillance, other confidential informants, and documents. CI-2 does not have any current federal charges and is not under consideration for federal charges in the Eastern District of Virginia. In sum and substance, the information related by CI-2 is described below.

35. According to CI-2, there are several individuals involved in the conspiracy to distribute oxycodone 30 mg pills acquired with fraudulently produced prescriptions. CI-2 identified the producer of the prescriptions as UCC1. CI-2 is aware that the conspiracy has been going on since at least November 2012, and that UCC1 works at a Computer Information Technology company located in Herndon, Virginia. UCC1 also drives a gold Mercedes Benz.

36. CI-2 also stated that UCC1 produces the prescriptions from a computer located at UCC1's place of employment. UCC1 uses the identities of unwitting doctors as the prescribers. After UCC1 produces the prescriptions on the work computer, UCC1 prints them out, writes in the patient information, and forges the doctor's signature. UCC1 then gives the prescriptions to others to fill at pharmacies. UCC1 never fills the prescriptions. On at least one occasion during the summer of 2013, C.B. told CI-2 that he watched UCC1 produce prescriptions on the

computer in the hotel lobby of the Holiday Inn Express, and access her email account from that same computer.

37. CI-2 has presented and filled fraudulent oxycodone 30 mg prescriptions produced by UCC1 on five separate occasions. CI-2 never used CI-2's true identity as the patient, and CI-2 noted that the names of two different doctors were used on the prescriptions. CI-2, however could not recall the identity of the doctors. Each time CI-2 filled a prescription for UCC1, UCC1 paid CI-2 with ten oxycodone 30 mg pills from the pill bottle that CI-2 procured for UCC1. UCC1 kept the rest of the pills to use and sell.

38. CI-2 is aware that ALFARO, AL NIMIRY, LEE, C.B., M.S., S.S., J.H., M.O., and M.G. are also involved in filling fraudulent prescriptions produced by UCC1. CI-2 has been present when several of these individuals filled fraudulent prescriptions. Each person received ten to fifteen oxycodone 30 mg pills from the bottle they obtained from the pharmacy each time they passed a fraudulent prescription. CI-2 knows that ALFARO passed prescriptions for UCC1 between 30 and 40 different times. LEE, a major distributor and co-conspirator with UCC1, passed 6 or more prescriptions per week under the direction of UCC1.

39. AL NIMIRY passed fraudulent prescriptions on a daily basis in his own name or the names of others. M.O. told CI-2 that he and AL NIMIRY frequently passed five fraudulent prescriptions over the course of a week. Indeed, CI-2 was with AL NIMIRY on at least two occasions when AL NIMIRY passed and paid for fraudulent prescriptions for 60 to 90 oxycodone 30 mg pills, one of which was in AL NIMIRY's true name.

40. Law enforcement officers obtained reports from the VPMP that identified six different occasions between April 12, 2013 and September 9, 2013 in which the name AL NIMIRY, date of birth XX/XX/1989, was used to fill prescriptions for oxycodone 30 mg pills. Three different physicians were identified as the prescribers of these oxycodone pills. Law

enforcement contacted the corresponding prescribers to determine if the prescriptions were legitimate. Each prescriber identified the prescription under their name as fraudulent.

41. CI-2 has also purchased oxycodone 30 mg pills from UCC1 on three different occasions. J.H. facilitated the transactions between UCC1 and CI-2. Further, since May 2013, CI-2 has witnessed UCC1 sell oxycodone 30 mg pills approximately six times to other people. Although UCC1 usually sells the oxycodone 30 mg pills for $30 to $45 per pill, CI-2 is aware that UCC1 will drop the price for customers that purchase 20 or more pills at a time.

### F. Confidential Informant Number 3

42. Information in this affidavit was also obtained with the assistance of Confidential Informant 3 ("CI-3") who was interviewed by law enforcement in June and October 2013. CI-3 had been arrested in Fairfax County and Prince William County, and volunteered to provide information on this investigation. The information CI-3 provided to local enforcement was corroborated through several sources, including confidential informants, physical surveillance, video surveillance, and documents. CI-3 does not have any outstanding federal charges and is not receiving any consideration for federal charges in the Eastern District of Virginia. In sum and substance, the information provided by CI-3 is related below.

43. CI-3 met UCC1 through A.H. in approximately January 2012. According to CI-3, UCC1 is involved in a conspiracy to produce fraudulent prescriptions for oxycodone 30 mg pills. Specifically, UCC1 directs people to fill fraudulent prescriptions at pharmacies located in Northern Virginia to obtain the pills for personal use and for profit. CI-3 first became aware of this conspiracy in approximately January 2013.

44. CI-3 noted that UCC1 has a contact in a Dental Office in Reston, Virginia that she refers to as "Erin." Erin works at the front desk and is the lead receptionist at the office. Erin generates the drafts of the prescriptions at her place of employment on behalf of UCC1. UCC1

told CI-3 that after generating the false prescriptions, Erin emails the drafts of the prescriptions to UCC1's email address. UCC1 will then access the drafts through a computer located at her place of work. UCC1 subsequently prints out the drafts, fills in the prescribing information, and signs the doctor's name. UCC1 has now "branched out" from the original prescription Erin provided by using other templates and other physicians' identities.

45. On at least one occasion, UCC1 told CI-3 that UCC1 was waiting for an email containing the draft of a fraudulent prescription to arrive from Erin, so that CI-3 could fill a fraudulent prescription.

46. In January 2013, CI-3 introduced UCC1 to AL NIMIRY. AL NIMIRY began purchasing oxycodone pills from UCC1 on a regular basis. AL NIMIRY also began passing fraudulent prescriptions produced by UCC1.

47. By the summer of 2013, AL NIMIRY was producing and passing his own fraudulent prescriptions, in addition to passing UCC1 produced prescriptions. Indeed, CI-3 passed fraudulent prescriptions produced by AL NIMIRY on seven to ten occasions. On each occasion, AL NIMIRY provided CI-3 with identification/driver's licenses of individuals that resembled AL NIMIRY and CI-3.

48. According to CI-3, AL NIMIRY developed a contact at a CVS pharmacy in Fairfax, Virginia that provided AL NIMIRY with names of unwitting persons to place on his fraudulent prescriptions. This person, hereinafter referred to as UNSUB, was a pharmacy technician. In July or early August 2013, CI-3 observed UNSUB smoking a cigarette outside the pharmacy while he talked with AL NIMIRY. On one occasion, when AL NIMIRY and CI-3 went to the pharmacy to fill a fraudulent prescription, UNSUB told AL NIMIRY to come back later because the pharmacist that was currently on duty would scrutinize the prescription and not fill it.

49. The fraudulent prescriptions AL NIMIRY produced were issued for 90 oxycodone 30 mg pills. AL NIMIRY gave CI-3 the money to fill the prescription, which was approximately $80, on two occasions. On two other occasions, the unwitting person's name on the prescription had insurance coverage, so the prescription only cost $10 to $14. Each time CI-3 filled a prescription for AL NIMIRY, CI-3 received 10 to 15 oxycodone 30 mg pills as payment. On one occasion, however, the pharmacy only had 28 pills, so Al NIMIRY only paid CI-3 four pills. One of the prescriptions CI-3 passed on behalf of AL NIMIRY was in the name of M.S. According to a report acquired from the VPMP by law enforcement officers, a CVS pharmacy filled a prescription for oxycodone 30 mg pills issued to M.S. on July 8, 2013. This prescription listed Dr. R.N. as the prescriber. Law enforcement officers contacted Dr. R.N. to determine if the prescription was legitimate. Law enforcement determined that Dr. R.N. never issued a prescription to M.S., and that M.S. was never treated or seen by Dr. R.N.

50. CI-3 was present on two occasions when AL NIMIRY produced fraudulent prescriptions at two different FedEx stores in Sterling, Virginia. CI-3 watched AL NIMIRY log onto computers at the FedEx stores to access the fraudulent prescriptions. On each occasion, AL NIMIRY would print out the fraudulent prescription to be passed later that same day.

51. CI-3 is also aware that M.A. passed fraudulent prescriptions produced by AL NIMIRY on at least two separate occasions.

52. On or about February 2013, CI-3 introduced ALFARO to UCC1. ALFARO passed several prescriptions produced by UCC1 and received oxycodone 30 mg pills as payment from UCC1.

53. CI-3 is personally aware that LEE purchased pills on a regular basis from UCC1.

54. In mid-February 2013, CI-3, ALFARO, and UCC1 drove to meet Erin outside her dental office in Reston, Virginia to give her some oxycodone 30 mg pills as proceeds and to pay

her $500, which was the amount Erin had charged UCC1 for helping UCC1 produce the fraudulent prescriptions. CI-3 and ALFARO waited in the car while UCC1 went to make the payment.

55. On at least one of the occasions when CI-3 successfully passed a fraudulent prescription at UCC1's direction, UCC1 wrote CI-3's phone number as the phone number of the doctor's office on the fraudulent prescription. CI-3 gave CI-3's cell phone to UCC1 before entering the pharmacy to pass the prescription. When the pharmacist called the number on the prescription to verify the prescribing information, UCC1 answered the phone and pretended to be an official from a doctor's office. According to CI-3, Erin trained UCC1 on the proper method to communicate with a pharmacist.

56. CI-3 successfully filled approximately six prescriptions provided by UCC1 at pharmacies located in Northern Virginia. CI-3 presented fraudulently produced oxycodone 30 mg prescriptions by UCC1 on approximately five other occasions, but was told by the pharmacists that they were out of oxycodone 30 mg pills. After each successful attempt, CI-3 exited the pharmacy with a bottle of oxycodone 30 mg pills, returned the bottle of oxycodone 30 mg pills to UCC1, and UCC1 paid CI-3 with ten oxycodone 30 mg pills.

### G. Confidential Informant Number 4

57. Information in this affidavit was also obtained with the assistance of Confidential Informant 4 ("CI-4"), who was interviewed by law enforcement on October 24, 2013. CI-4 is a close friend of several members of the conspiracy. CI-4 voluntarily reported information to local law enforcement that was corroborated through several sources, including confidential informants, physical surveillance, video surveillance, and documents. CI-4 does not have any outstanding federal charges and is not receiving any consideration for federal charges in the Eastern District of Virginia. In sum and substance, CI-4 related the following information.

58. CI-4 was injured in an accident in 2010 and received a legitimate prescription for oxycodone to recover from the injury. After CI-4 recovered from the injury, CI-4 continued to use and abuse oxycodone pills for approximately four years.

59. In approximately the fall or early winter of 2010, CI-4 began buying one to two oxycodone 30 mg pills per week from street dealers. Soon, LEE and ALFARO became the primary sources of oxycodone 30 mg pills for CI-4. LEE and ALFARO sold CI-4 pills for $30 per pill. CI-4 is aware that during this time H.M. was providing LEE and ALFARO with some of the oxycodone pills. As CI-4's addiction to oxycodone increased, CI-4 began to purchase more pills from ALFARO and LEE. Specifically, from March 2013 until September 2013, CI-4 purchased 7 to 14 oxycodone 30 mg pills per week from LEE and/or ALFARO.

60. During the summer of 2013, CI-4 became aware that LEE, ALFARO, AL NIMIRY, C.B., J.H., M.G., and others were involved in a conspiracy to manufacture false prescriptions for oxycodone 30 mg pills and pass them at pharmacies to obtain the pills for distribution and consumption. LEE and ALFARO told CI-4 that the pills CI-4 purchased from them came from passing fraudulent prescriptions produced by UCC1.

### H. Confidential Informant Number 5

61. Information in this affidavit was also obtained with the assistance of Confidential Informant 5 ("CI-5"), who was interviewed by law enforcement on October 9, 2013 while incarcerated on an unrelated charge. CI-5 voluntarily reported information to local law enforcement that was corroborated through several sources, including confidential informants, physical surveillance, video surveillance, and documents. CI-5 does not have any outstanding federal charges and is not receiving any consideration for federal charges in the Eastern District of Virginia. In sum and substance, CI-5 provided the information related below.

62. In the late spring or summer of 2013, C.B. told CI-5 that ALFARO introduced him to a person, later identified by C.B. as UCC1, who paid people that went into a pharmacy to fill a fraudulent prescription produced by UCC1 for oxycodone 30 mg pills. Within a few days, ALFARO and AL NIMIRY came to CI-5's residence with a significant quantity of oxycodone 30 mg pills that, according to ALFARO, she obtained by passing a fraudulent prescription from the conspiracy described above by C.B. to CI-5. ALFARO sold CI-5 two of these oxycodone 30 mg pills after she retrieved them from AL NIMIRY, who possessed the bottle with the pills. CI-5 paid ALFARO $35 per pill.

63. ALFARO eventually introduced CI-5 to UCC1 as the producer of the fraudulent prescriptions. CI-5 purchased oxycodone 30 mg pills from UCC1 approximately 10 different times. Through CI-5's association with UCC1, CI-5 became aware that UCC1 frequently directed LEE, ALFARO, and J.H. to assist UCC1 in passing fraudulent prescriptions. In return for passing the fraudulent prescriptions they were each given several oxycodone 30 mg pills as payment. J.H. is UCC1's closest contact and one of the only people with direct contact to UCC1. J.H. probably passed the most fraudulent prescriptions produced by UCC1. After J.H., LEE and ALFARO passed the most fraudulently produced prescriptions at UCC1's direction.

### III. CONCLUSION

64. Law enforcement acquired reports from the VPMP that identified approximately 200 fraudulent prescriptions, or 16,000 pills, for oxycodone 30 mg pills associated with the following prescribers: M.N., R.N., J.G., M.G., C.P., and A.G. Each prescriber identified the prescriptions as fraudulent. Most of the prescriptions issued were for 60 to 120 oxycodone 30 mg pills. ALFARO, LEE, AL NIMIRY, C.B., J.H., M.G., S.S. are among the names on the prescriptions that have been identified by the prescribers as fraudulent.

65. Based on the information provided in this affidavit, probable cause exists to believe that from on or about October 2012 through on or about November 2013, within the Eastern District of Virginia, JACQUELINE ALFARO, also known as "Adriana Hernandez Alfaro" and "Francia Hernandez," OLIVIA MY AHN LEE, and MOSTAFFA MOHAMED AL NIMIRY, did knowingly, intentionally, and unlawfully combine, conspire, confederate, and agree with each other, and with others, known and unknown, to distribute a mixture and substance containing a detectable amount of oxycodone, a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and 846.

66. Wherefore, I respectfully request that this Court issue a criminal complaint charging JACQUELINE ALFARO, also known as "Adriana Hernandez Alfaro" and "Francia Hernandez," OLIVIA MY AHN LEE, and MOSTAFFA MOHAMED AL NIMIRY with violations of 21 U.S.C. §§ 841(a)(1) & 846, and arrest warrants authorizing their arrests.

_____
Andrew B. Lenhart
Special Agent, FBI

Sworn and subscribed to before me this 14
day of November, 2013, at Alexandria, Virginia.

_____/s/_____ JM
The Honorable John F. Anderson
United States Magistrate Judge